The Streine Tool & Manufacturing Company, a Corporation, v. Commissioner.
Streine Tool & Mfg. Co. v. Commissioner
Docket No. 3765.
United States Tax Court
1945 Tax Ct. Memo LEXIS 136; 4 T.C.M. (CCH) 684; T.C.M. (RIA) 45214; June 28, 1945
*136 Robert S. Marx, Esq., 900 Traction Bldg., Cincinnati 2, Ohio, for the petitioner. Cecil H. Haas, Esq., for the respondent. LEECH
LEECH, Judge: This controversy involves deficiencies in income tax, declared value excess-profits tax and excess-profits tax for the years 1940 and 1941, as follows: Declared Value
Excess-Profits
Excess-Profits
Year
Income Tax
Tax
Tax
1940
$3,740.49
1941
5,571.11
$1,546.50
$27,304.43
The sole issue is whether the amounts of compensation paid by petitioner in the taxable year 1941 to one officer and four employees was reasonable. Respondent at the trial conceded the issue relating to salaries for the year 1940, thus waiving the claimed deficiency for that year in its entirety. For the year 1941, respondent made a partial concession of the salary issue. He now allows a deduction for the five individuals of the total amount of $49,884.55 of the claimed deduction of $69,324.05, and claims the payments were excessive to the extent of $19,439.50. Petitioner concedes the second issue relating to the deduction as expenses of an item of $2,547.24. Effect will be given to these respective concessions in the *137 computation under Rule 50. Findings of Fact Petitioner is an Ohio corporation organized in 1918 with its plant and general offices located at New Bremen, Ohio. Its Federal tax returns for the years involved were filed with the collector of internal revenue for the tenth district of Ohio. In 1941, it had outstanding 684 shares of preferred and 342 shares of common of the par value of $100 each. The 342 shares of common were held by 20 stockholders. Petitioner is engaged in manufacturing and selling machines for shearing, squaring and corrugating sheets of steel and aluminum. Many of its products are specially designed, engineered and tooled to meet the individual requirements of its customers, among which were the Carnegie-Illinois Steel Corporation, Inland Steel Company, The American Rolling Mill Company, Great Lakes Steel Company, White Steel Company, and The Aluminum Company of America. Some of the cutting machines range up to 100 feet in length, weigh upwards of 500,000 pounds and, depending upon their size and detail of construction, range in cost from $45,000 to $110,000. The selling of the product is a combination of salesmanship and engineering. In 1927, petitioner engaged *138 Storm B. Haarbye, a sales engineer, to take charge of its sales. Haarbye had obtained his engineering education at the Norwegian Military Academy. Prior to his connection with petitioner, he was an official of the U.S. Steel Corporation and had close contacts with other steel companies. Under his contract with petitioner he received a commission of 10 per cent on the sales price of all automatic equipment and 5 per cent on standard equipment petitioner sold. In the latter years during which Haarbye was employed he was allowed $200 a month for traveling expenses in addition to commissions. During the period 1936 to April 1, 1940, the compensation paid to Haarbye by petitioner was as follows: 1936
$33,075.90
1937
30,872.22
1938
38,376.30
1939
25,962.70
1940 (to April 1st)
12,616.45
Petitioner was not receiving satisfactory cooperation from Haarbye and his services were terminated on April 1, 1940. Thereupon the president and general manager, Frank Dine, recommended to the board of directors a division of the duties theretofore performed by Haarbye among himself and the 4 key employees of petitioner. The minutes of a meeting of the directors held on May 16, 1940 disclose *139 the following: "* * * Manager Dine advised the Board, since Mr. Haarbye's services had been terminated a different arrangement for commissions should be made and upon the motion of C. F. Eiting, seconded by John Herkenhoff, it was agreed to split 5 per cent of the sales value of equipment after traveling expenses had been deducted between E. A. Kiefer, Joe Kiefer, Paul Dine, Frank Dine and Lee Harmony * * *" Pursuant to this resolution, petitioner, in 1940 and 1941, allocated 5 per cent of the sales among the persons named therein. In addition to the percentage of proceeds of sales, Frank Dine received a bonus of $4,000 and Paul Dine a bonus of $2,500. The basic salary paid by petitioner to the 5 individuals during the taxable year 1941 was as follows: Frank W. Dine
$5,252.00
Lee Harmony
3,095.00
Edward A. Keifer
3,120.00
Joe E. Kiefer
3,900.00
Paul Dine
2,303.50
The total compensation paid for the years 1936 to 1941, inclusive, is shown in the following table: Year
Frank W. Dine
Lee Harmony
Edward A. Kiefer
Joe E. Kiefer
Paul Dine
1936
$13,125.00
$ 2,105.00
$ 2,370.00
$ 1,995.00
1937
15,026.76
2,248.96
2,638.75
$ 3,150.00
2,105.90
1938
15,252.00
3,000.00
3,000.00
3,900.00
3,000.00
1939
9,252.00
3,355.75
3,610.75
3,900.00
4,606.00
1940
12,178.95
5,786.95
6,046.95
6,826.95
7,532.95
1941
18,282.71
12,125.71
12,150.71
12,930.71
13,834.71
*140 The respondent claims the amounts paid in 1941 were excessive in the following amounts: Frank W. Dine
$ 2,450.08
Lee Harmony
4,602.68
Edward A. Kiefer
4,289.68
Joe E. Kiefer
4,055.68
Paul Dine
4,041.38
Total
$19,439.50
Only Frank W. Dine and Paul Dine were shareholders of the petitioner. The former held 12 shares, or a 3 1/2 per cent interest, and the latter, 2 shares, or an interest of approximately one-half of one per cent. The following schedule sets forth petitioner's gross sales, net income before taxes, net value of plant and equipment, and the dividends paid on the common stock for the years 1936 to 1941, inclusive: Net Income
Net Value Plant
Dividends
Year
Gross Sales
Before Taxes
and Equipment
Paid
1936
$466,503
$ 56,120.08
$100,413.44
$107,730
1937
469,691
36,628.48
117,080.31
20,520
1938
460,880
104,367.56
109,032.87
17,100
1939
418,295
27,896.01
117,312.97
17,100
1940
485,575
61,492.29
138,582.92
17,100
1941
928,891
129,002.70
182,572.50
34,200
Frank W. Dine, 49 years of age, has been president and general manager with full responsibility of the plant since 1935. He learned *141 the machinist trade, attended Purdue University where he studied mechanical engineering, and then became associated with several large tool companies. Later he had charge of the engineering department of the Minster Machine Company. For 10 years prior to associating with petitioner, he was general manager of the Brand Furniture Company. Joseph E. Kiefer is the chief engineer and has been associated with petitioner for 22 years. He was graduated from Ohio State University and has followed the profession of mechanical engineering ever since that time. One of his duties is to attend all technical meetings with the heads of engineering departments of the buyers. He prepares the proposed drawings and the blueprints of the essential details. He took over the responsibility of the general design formerly the responsibility of Haarbye. Edward A. Kiefer is the plant superintendent and has been with petitioner for 30 years. Prior to his association with petitioner he was connected with several steel mills. It is his responsibility to produce the machinery from the engineering drawings. The increased sales greatly increased his responsibilities and necessitated his working many hours overtime. *142 Paul E. Dine is supervisor of installation and maintenance of equipment. He has been associated with the machine tool business for the past 17 years. Prior to his association with petitioner he was connected with General Motors, the Minster Machine Company and the Federal Machine Sales Company. He supervises the shipping of the machines, their erection at the plant of the purchasers, and trains the crews that are to operate them. Since petitioner guarantees the machine it is his responsibility to see that it satisfactorily performs the work for which the customer acquired it. Lee Harmony is a salesman and office manager. He has been associated with petitioner for 17 years. He makes the contacts with petitioner's customers, estimates the cost of materials and labor and fixes the price at which the machine is to be sold. None of the 4 employees had any written agreement for any fixed period and were free to sever their association with petitioner. Since 1937, petitioner's business has felt the impetus of the war. It had war business with Russia, France, England and Japan. In the taxable year it had a number of direct contracts with the United States Government, and the remainder *143 of its business was with its regular customers who were vitally affected by war conditions. The compensation paid by petitioner to Frank W. Dine, Lee D. Harmony, E. A. Kiefer, Joe E. Kiefer and Paul E. Dine, respectively, during the taxable year, was reasonable. Opinion The contested issue is whether the compensation paid by petitioner to its five key men in the taxable year 1941 for services rendered is reasonable. n1 This fact question is to be determined from a consideration of all the circumstances involved in the particular case presented. Capitol-Barg Dry Cleaning Co. v. Commissioner, 131 Fed. (2d) 712.[1]The burden of establishing the fact, of course, falls upon the petitioner. Shield Co., 2 T.C. 763. The test of reasonableness is to be applied to the salary received by each individual and not to the aggregate salaries paid. Shield Co., supra.The basic salaries paid are not questioned. The controversy arises with respect to the "contingent" compensation based on the allocation of an amount equal to 5 per cent of the sales, 1 per cent of which sum was paid to each of the five individuals. Contingent compensation is given recognition *144 by the Treasury Regulations. n2 The contingent compensation was authorized by resolution of the board of directors. [2]Three of the individuals to whom it was paid were mere employees, having no financial interest in the company. Under such circumstances the action of the directors may be said to support the inference that the payments were reasonable. Ox Fibre Brush Co. v. Blair, 32 Fed. (2d) 42; Toledo Grain & Milling Co. v. Commissioner, 62 Fed. (2d) 171; Capitol-Barg Dry Cleaning Co. v. Commissioner, supra.Of the other two individuals receiving the contingent compensation, Paul E. Dine was not an officer or director, but owned two shares of the common stock. The remaining individual, Frank W. Dine, was the president and a director. He held 12 shares out of a total of 342 shares outstanding. The respondent makes no claim that the payments were a disguised distribution of earnings. The contingent compensation paid to the two individuals having a small stock interest was the same in amount as that paid to the other three who were mere employees. We find nothing to indicate the payments were other than the result of a free bargain. The plan, put *145 in effect by corporate action, has achieved favorable results to the company. Its selling cost was reduced and its gross sales in 1941 nearly doubled its 1940 sales. Its net income before taxes for the taxable year more than doubled that of the prior year and the cash dividends paid were increased 100 per cent. The respondent argues that the increased sales were the result of a demand created by war conditions. Undoubtedly such is the fact, but we do not perceive its importance on the question of reasonableness of the salaries paid. Doubling the output necessarily increased the responsibility of the key individuals charged with the duty of producing, selling and installing the product. Especially so here, where there was no material increase in the plant or the number of employees. Petitioner's proof shows that four of the individuals involved were not under any contract to remain with the company; their basic salaries were modest; the demand for men of their experience and ability was very great in the machine and tool industry; and the salaries paid were reasonable when compared with those paid to persons performing similar services for competitive concerns and companies engaged *146 in the heavy tool industry. Petitioner introduced the testimony of Arthur C. Nolte, personnel manager and controller of the American Tool Company for the past twenty years; Harry S. Robinson, who has been engaged in the industry for the past twenty-seven years and at present is general manager of the Cincinnati Shaper Company, a competitor of petitioner in respect to one line of products; Adolph Zuest, who for the past seventeen years has been an executive of the G. A. Gray Company, which manufactures heavy machine tools, planers and milling machines, some of which sell for upwards of $100,000. All of these men, who are well qualified in this line of production, expressed the opinion that the compensation paid by petitioner to its five key men was fair and reasonable. This testimony was not impugned on cross-examination. Nor was it effectively contradicted by the history of the petitioner or otherwise. While we are not bound by expert testimony, in the circumstances the character and quality of this testimony, we think, can not be and was not ignored. Since the basic salaries paid these five individuals were comparatively modest, we have no doubt that petitioner adopted its plan *147 of contingent compensation to co-ordinate and increase the activity, diligence and loyalty of its key men and to adequately compensate them without beforehand incurring any certain money obligation. Neither the means by which petitioner determined the aggregate amount which was thus contingently payable to these key men for 1941, nor the method of measuring the amount to be paid to each individual, is decisive. Our inquiry is limited to the single question of whether the total amount paid to each, as compensation, was reasonable for the services they rendered petitioner. We conclude on all the evidence that it was reasonable. The petitioner is sustained on the salary issue. Decision will be entered under Rule 50. Footnotes
1. Sec. 23 (a) (1) (A), Internal Revenue Code↩.
2. Regs. 103, Sec. 19.23 (a)-(6) (2).↩